UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DIANE KASPER and
LAURENCE KASPER,

                           Plaintiffs                DECISION AND ORDER

-vs-

                                                 07-CV-6146 CJS

RICHARD A. DAMIAN, M.D.
GUTHRIE CLINIC, LTD., and
ROBERT PACKER HOSPITAL,

                           Defendants
_____

APPEARANCES

| | |
|---|---|
| For Plaintiffs: | Christina Bruner Sonsire, Esq.<br>Ziff Law Firm<br>303 William Street<br>Elmira, New York 14902 |
| For Defendants: | Donald S. Thomson, Esq.<br>Davidson & O'Mara, P.C.<br>243 Lake Street<br>Elmira, New York 14901 |
| | Matthew W. Rappleye, Esq.<br>Stevens and Lee<br>25 North Queen Street, Suite 602<br>Lancaster, Pennsylvania 17608 |

INTRODUCTION

      This is a diversity action alleging medical malpractice in connection with injuries sustained during a laparoscopic gallbladder surgery. Now before the Court is Plaintiffs' motion (Docket No. [#25]) for partial summary judgment as to liability. For the reasons that follow, the application is denied.

1

BACKGROUND

Unless otherwise noted, the following are the facts of this case, viewed in the light most favorable to Defendants. On May 6, 2005, Plaintiff Diane Kasper ("Mrs. Kasper") underwent a laparoscopic cholecystectomy to remove her gallbladder. The surgery was performed by defendant Richard Damian, M.D. ("Damian"). The surgery, when properly performed, requires the surgeon to transect the cystic duct and cystic artery, and to remove the gallbladder. However, as will be discussed further below, the surgeon must also avoid cutting the nearby hepatic ducts and the common bile duct, and in that regard Damian failed. The issue before the Court is whether such failure was malpractice as a matter of law, or whether there are triable issues of fact for a jury to decide.

During the subject surgery, Damian observed that Mrs. Kasper's bile ducts were inflamed. (Plaintiff's Statement of Facts ¶ 23). Damian also observed "a lot of thickening of the fat that's normally in th[e] location" of the gallbladder, such that "what [one] would deem as normal anatomy, wasn't immediately apparent." (Damian Deposition at 43). Damian attempted to locate the relevant sections of Mrs. Kasper's anatomy, consisting of "the gallbladder/cystic duct junction," the Calot lymph node, and the cystic artery, but the process was made difficult by the thickened tissue. (*Id*. at 44; *see also, id*. at 52:"[T]he gallbladder looked somewhat inflamed, the tissues were thickened near the bottom portion of the gallbladder making, you know, dissection difficult."). Damian was aware that, when a surgeon cannot adequately identify a patient's anatomy, it may be appropriate to convert the laparoscopic surgery to an "open" (laparotic) surgery, or to use intraoperative cholangiography (an x-ray

examination of the biliary system), to help visualize the anatomy. (*Id*. at 52-58). Damian opted instead to conduct further dissection to identify the structures. (*Id*. at 57: "[S]ometimes, when the anatomy is not clear, it just takes more dissection to clarify the anatomy."). Damian began "stripping the tissues, sort of layer by layer to try to look for" the relevant structures, until he felt satisfied that he had identified the cystic duct and cystic artery:

> [W]e had a lot of difficulty in opening up this which should be a relatively thin flimsy tissue, it was very thick and we stopped multiple times to sort of keep looking at the anatomy until we were happy to a point where we had identified, at least to our degree of satisfaction, what we thought was the cystic duct and where it met the common bile duct and the artery.

(*Id*. at 44). Damian placed surgical clips on what he believed were the cystic duct and cystic artery, cut those structures, and then removed the gallbladder from the liver using an "electrocautery device." (*Id*.). Damian's surgical notes state, in relevant part:

> [W]e proceeded to identify the gallbladder. We clamped it in the fundus and retracted up. Using blunt dissection the Calot triangle was identified and dissected. All the components of the triangle were identified. This including the common bile duct, the cystic duct, and the cystic artery. After proper identification of the cystic artery this was clamped with large clips proximally and distally and transected. The Calot triangle was identified and dissected properly. It was noted that the tissues were inflamed, friable, and with minimal hemorrhagic bloody oozing. The cystic duct was clearly identified and dissected. It appeared to be dilated. We proceeded to clip it proximally twice and distally once and then transect it. Then the cystic artery also previously identified was clipped and transected. At all times the common bile duct was identified and kept out of the surgical field. After this we proceeded to perform antegrade cholecystectomy dissecting the gallbladder from the liver bed using laparoscopic hook electrocautery.

(Pl. Motion for Partial Summary Judgment, Exhibit T).

Approximately two days later, on May 9, 2005, Mrs. Kasper experienced an abnormal amount of pain and other symptoms, including bile leakage, whereupon further surgery established that her hepatic ducts were cut, and that a section of her common bile duct was missing altogether. (Plaintiff's Stmt. of Facts, ¶ ¶ 33-35). Specifically, Thomas Vandermeer, M.D. ("Vandermeer") performed surgery to repair damage to Mrs. Kasper's common bile duct, during which he observed that a section of Mrs. Kasper's common bile duct was missing, and that four hepatic ducts were cut. (Vandermeer Dep. at 15, 20-22). As for the hepatic ducts, Vandermeer stated that they appeared to have been cauterized during the process of removing the gallbladder from the liver. (*Id*. at 22-23). Vandermeer characterized the unintended removal of the common bile duct as a "classic injury" resulting from a mistake, or "pattern recognition problem," during a cholecystectomy:

> [T]he most frequent serious injury [is] caused in this way where the . . . [cystic] duct that drains the gallbladder is mistaken for the main bile duct and that gets divided and then the surgeon thinks that the bile duct is the site of the gallbladder and then ends up removing the whole bile duct.

(*Id*.; *see also, id*. at 40). Vandermeer maintains that such injury had to have occurred during Damian's surgery: "I think if you have a gallbladder operation and three days later your bile duct is missing, unless you're abducted by martians or something bizarre happened, you know, I mean, it just sort of stands to reason that probably happened." (*Id*. at 17).

On March 16, 2007, Plaintiffs commenced the subject action, alleging medical malpractice under the law of the State of Pennsylvania. On June 18, 2009, following a period of pretrial discovery, Plaintiffs filed the subject motion for partial summary

4

judgment as to liability. Plaintiff's contend that Damian caused Mrs. Kasper's injuries by breaching the relevant standard of care. In that regard, Plaintiff's maintain that upon encountering difficulty in identifying Mrs. Kasper's anatomy, Damian should have employed "standard safety devices," such an "intraoperative cholangiogram . . . or conversion to an open procedure," or else should have consulted "a specialist or other certified physician to help [him] identify and visualize [Mrs. Kasper's] relevant anatomy." (Pl. Stmt. of Facts, ¶ 24).

In support of their application, Plaintiffs cite, *inter alia*, the opinions of their expert witness, I. Michael Leitman, M.D. ("Leitman"), who maintains that Damian breached the standard of care. Leitman's expert report states, in relevant part:

> If Dr. Damian had performed proper dissection of the cystic duct and saw the junction with the common bile duct, and avoided the hilum of the liver in this dissection, this complex injury would not have occurred. If he were unable to do so, then the use of intra-operative cholangiography would have, more likely than not, prevent this injury to Diane Kasper. . . . It is well principled that prior to clipping any structures in performing a cholecystectomy, the surgeon must be certain that he or she has clearly visualized and identified the cystic duct that goes directly to the gallbladder as well as visualize to be sure that no clips are being placed on the common bile [duct]. . . . Prior to placement of clips and transection, the standard of care requires that the surgeon be sure that it is the cystic duct, and not the common duct, that is clipped and divided.

(Pl. Motion for Partial Summary Judgment, Exhibit Q). At his deposition, Leitman testified that during a laparoscopic cholecystectomy, complications may include the misidentification of the common bile duct, but that such complication, " is very well known by surgeons, but surgeons are trained to avoid it. . . . [I]n *most instances*, an injury such as this . . . is avoidable if surgeons comply with the standard of care." (Leitman Dep. at 10) (emphasis added). Leitman stated that the standard of care

involves following a set of procedures to properly identify the relevant anatomy.(*Id*. at 11). On this point, Leitman testified to the steps that Damian should have taken in accordance with the standard of care to ensure that he was cutting the proper structures:

> One is to be sure that there are only two structures going from the gallbladder to the hepato[duodenal] ligament. Number two is, further dissection to identify the junction between the cystic duct and the gallbladder and/or the cystic duct and the common bile duct. Or the performance of an intraoperative cholangiogram or a retrograde dissection, that is taking the gallbladder down from the top of the dome of the gallbladder back toward the cystic duct. Or converting to an open procedure and having the ability to have some tactile feedback in three dimensionality to be able to remove the gallbladder that way and avoid injury to the common duct.

*Id*. at 19-20. Leitman further maintained that Damian should have realized his error because he had to cut three structures during the surgery, "the hepatic duct[s], common bile duct, and more likely than not the cystic artery," when he should have had to cut only two structures, "the cystic artery and the cystic duct." *Id*. at 13-14.[1] Leitman also stated that Damian's reported use of "large clips" during transection of what he thought was the cystic artery was atypical, and should have caused Damian to "take further steps to identify proper anatomy." *Id*. at 13, 15. Leitman opined that, although Damian's notes indicate that during Mrs. Kasper's surgery the cystic artery was cut twice, such was not the case: "[I]n my opinion because of the size of the structures and the need for the large clips and from subsequent treatment records [indicating that the common hepatic duct was cut], they were not the cystic artery both times." *Id*. at 17.

---

[1]Leitman stated that there is one situation in which three structures would be cut during a cholecystectomy, but that such situation would present itself "different visually than what's described in [Damian's] operative report." *Id*. at 16. Such situation would required cutting the cystic artery in two places, and also cutting the cystic duct. *Id*.

With regard to the size of the surgical clips, Leitman stated that "seven millimeter clips are typically used for laparoscopic gallbladder surgery." *Id*. at 18. Leitman stated that the common duct, which should not be cut, is usually larger than the cystic artery, and that, "if you see a large duct, you have to be doubly sure that it's not the common duct because that tends to be a little bit larger, and before clipping and dividing a larger structure, one needs to ensure that the structure that you're about to clip and cut is not the common duct." *Id*.

Defendants oppose Plaintiffs' application, though they generally agree with Plaintiffs concerning the steps that a surgeon ought to take in accordance with the standard of care. Defendants' expert witness, Dr. David A. Krusch ("Krusch"), testified regarding the standard of care for a surgeon performing a laparoscopic cholecystectomy. Krusch indicated that, "[w]hen the surgeon has difficulty and that difficulty cannot be overcome by the dissection to a point where the surgeon feels comfortable that they can see the anatomy clearly, they should employ an additional technique to help them clarify the anatomy." (Krusch Dep. at 47). In that regard, Krusch stated:

> If the surgeon during the course of a laparoscopic cholecystectomy does not believe that they can clearly identify the anatomy, they should do one of three things. They should do an intraoperative cholangiogram, they should open and perform the procedure, open – convert and perform the procedure open, or they should consult someone who is potentially more expert or has a second set of eyes to help them clearly identify the anatomy.

(Krusch Dep. at 35). As to the relevant anatomy, Krusch maintains that

> there's parts of the biliary tree that we should never be near during the surgery. But, specifically, you want to see the junction of the infundibulum and the cystic duct. You want to see the junction of the cystic duct and

7

> the common bile duct, and you want to see the artery clearly in the
> triangle of Calot. Those are the key features.

(Krusch Dep. at 49). As far as the standard for proper identification, Krusch stated that the surgeon must "believe that they have clearly identified the anatomy," "to the best of the surgeon's knowledge." (*Id*.). Krusch concedes that, in hindsight, Damian misidentified Mrs. Kasper's anatomy and mistakenly damaged the common bile duct and hepatic ducts. (Krusch Dep. at 48-49, 50-53, 60). Nevertheless, Krusch maintains that Damian did not violate the standard of care, because "the standard of care is based upon the surgeon's comfort and their belief during the procedure that they are clearly identifying the anatomy," and "because the operative note that Dr. Damian dictated [and] authenticated and signed in his words leads me to believe that he in his mind had clearly identified the anatomy at the time of the operation." (*Id*. at 50, 61). On this point, Krusch's expert report states, in relevant part:

> I do not find reason to believe that Dr. Damian deviated from a reasonable standard of care in performing the laparoscopic cholecystectomy. Throughout the procedure he clearly stated that he visualized the cystic duct, the cystic artery, and the common bile duct. He described what appeared to be normal anatomy and proceeded with the standard conduct for a laparoscopic procedure. He stated that there was some inflammation and friability of the tissues, but went on to describe normal anatomy and good progression of the procedure. Given this description I did not find reason to believe that Dr. Damian should have converted to an open procedure nor do I believe that the operative findings were an indication for an intraoperative cholangiogram. Despite the 'classic injury' that, in hindsight, occurred at the initial procedure, Dr. Damian clearly states that he had no indication that he had misidentified the common duct for the cystic duct. Literature has shown that in approximately 1 in 1000 cases, misidentification of otherwise apparently clear anatomy can

8

lead to bile duct injury.[2]

(Pl. Motion for Partial Summary Judgment, Exhibit R).

Damian also maintains that he followed the proper procedures for identifying the relevant anatomy. Damian contends that even if he mistakenly damaged the common bile duct and hepatic ducts,[3] he did not breach the standard of care, because during the surgery he took steps to identify the anatomy, as a result of which he believed that he had correctly identified the anatomy:

> Q. Do you agree that a transection of the common bile duct during a laparoscopic cholecystectomy is a violation of the standard of care?
>
> A. The intentional cutting of the common duct is a violation of the standard of care.
>
> ***
>
> If you know something's the common duct, you shouldn't cut it.
>
> ***
>
> If you have cut a duct that you have misidentified, that's an error, it's not a violation of a standard of care.
>
> ***
>
> If you have misidentified the ducts but you believe that that duct is the cystic duct and you believe you have identified it properly, it's not a violation of standard of care.

(Damian Dep. at 63-64). Damian further maintains that during the surgery, he intentionally cut only two structures, which he believed to be the cystic duct and cystic artery. (Damian Affidavit at ¶ ¶ 3-4). Damian contends that if the hepatic ducts were severed by electrocautery, as apparently happened, then "those structures must have

---

[2] *See also*, Krusch Deposition at 53 ("There is an incidence between .1 and .3, depending upon what you read, of injury to the bile duct in cases where the surgeon believes they have clearly identified the anatomy.")

[3] Damian is not sure how Mrs. Kasper's injuries occurred, but he concedes that the injuries occurred while he was performing the laparoscopic cholecystectomy. (Damian Dep. at 45-47, 97-98, 103, 105-106, 113, 123).

9

been hidden in the [liver] bed such that they were not able to be visualized during the procedure despite the exercise of care[.]" Damian further disputes Leitman's contention that the use of "large clips" should have caused him to realize that he was cutting the common bile duct. With respect to the clips, Damian states that "the appropriate size clip for the structure was utilized and none of the clips were of a size which should have given pause to consider the possible misidentification of the structure, with all structures that were clamped and transected being within the normal range of size to be anticipated." (*Id*. at ¶ 5).

On January 21, 2010, counsel for the parties appeared before the undersigned for oral argument of the motion.

## ANALYSIS

### *Rule 56*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to

support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996). Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.[4] The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*Medical Malpractice Under Pennsylvania Law*

The relevant legal principles in Pennsylvania are well-settled:

[M]edical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services. Thus, to prevail in a medical malpractice action, a plaintiff must establish a duty owed by the

---

[4]It is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)(citations omitted).

> physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm. Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury.

*Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. 245, 254-255, 824 A.2d 1140, 1145 (2003) (citations omitted). "[I]njury alone is insufficient to prove negligence in medical malpractice cases." *Id*., 573 Pa. at 256, 824 A.2d at 1146. "Determining whether there was a breach of duty . . . involves a two-step process: the court must first determine the standard of care; it then must examine whether the defendant's conduct measured up to that standard." *Id*., 573 Pa. at 261, 824 A.2d at 1149; *see also, id*., 573 Pa. at 264, 824 A.2d at 1151 ("[M]edicine is not an exact science. Much discretion exists in a doctor's practice of medicine that should not be condemned in hindsight."). In that regard, "to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury." *Id*., 573 Pa. at 261, 824 A.2d at 1149. "There is no requirement that [a doctor] be infallible, and making a mistake is not negligence as a matter of law. In order to hold a physician liable, the burden is upon the plaintiff to show that the physician failed to employ the requisite degree of care and skill." *Id*., 573 Pa. at 263, 824 A.2d at 1150 (citations omitted); *see also, Schaaf v. Kaufman*, 850 A.2d 655, 666 (2004) ("[D]octors are liable if they deviate from the standard of care, but if a judgment turns out to be wrong the doctor cannot automatically be found negligent.").

The foregoing principles establish that a doctor may commit an error without committing malpractice. A doctor's mistake in judgment is not actionable merely because it turns out to be wrong in hindsight, but rather, such a mistake will be actionable as malpractice if it reflects a failure to follow the standard of care:

> [A] mere mistake or error of judgment is not negligence. Although it is a legal axiom that a physician will not be held liable for a mere error of judgment, this is not to say that he or she cannot be found liable for a mistake of judgment or misdiagnosis. He is clearly liable *if his mistake reflects a failure to follow proper practice* and thereby violates the standard of care required of physicians.

*Carrozza v. Greenbaum*, 866 A.2d 369, 378 n. 14 (2004) (emphasis added; citations and internal quotation marks omitted). In that regard,

> in all medical malpractice actions, the proper focus is whether the physician's *conduct* (be it an action, a judgment, or a decision) was within the standard of care. If, on one hand, a physician's conduct violates the standard of care, then he or she is negligent regardless of the nature of the conduct at issue. If, on the other hand, a physician's conduct does not violate the standard of care, then he or she has not, by definition, committed any culpable error of judgment.

*Pringle v. Rapaport*, 980 A.2d 159, 173-174 (2009) (emphasis in original). "The standard of care for physicians in Pennsylvania is objective in nature, as it centers on the knowledge, skill, and care normally possessed and exercised in the medical profession," and therefore, "the physician's mental state is irrelevant in determining whether he or she deviated from the standard of care." *Id*., 980 A.2d at 174. In other words, in determining whether a doctor breached the standard of care the concern is with what the doctor actually did, or did not do, without regard to what he may have been thinking at the time.

13

In this case, Plaintiffs maintain that Damian committed two breaches of the relevant standard of care:

> Dr. Damian's failure to properly identify all relevant aspects of Diane's biliary anatomy – including her right and left hepatic ducts, cystic duct and common bile duct – before cutting and /or excising any portion of her biliary tree; and

> Dr. Damian's failure to take precautionary steps – including the utilization of an intraoperative cholangiogram, conversion to an open procedure and/or consultation with a specialist or other certified physician – if and/or when he became unable to continually visualize Diane's relevant biliary anatomy during the laparoscopic cholecystectomy.

(Pl. Memo of Law at 1). At the outset, the Court finds no support for Plaintiff's statement that a surgeon must "*continually*" visualize the relevant anatomy during surgery. (*See, id.; see also*, Pl. Stmt. of Facts ¶ 45). In fact, the Court is unable to find such a statement by any of the doctors in this action. In any event, Damian testified that it is not necessary or even *possible* to continually visualize all of the relevant structures during a laparoscopic surgery, and his statement is uncontested in the record. (Damian Affidavit at ¶ ¶ 10-11). Additionally, the Court cannot find any statement by Leitman or Krusch that a surgeon is specifically required to identify the "right and left hepatic ducts," as Plaintiffs contend above. Instead, Krusch refers to the triangle of Calot, which involves the common hepatic duct. Similarly, Leitman testified that the structures that were cut were the common hepatic duct, the common bile duct, and the cystic artery. (Leitman Dep. at 14). Otherwise, the Court agrees with Plaintiffs' statement of the standard of care, insofar as it requires a surgeon to identify the relevant anatomy, and to take additional steps if he cannot properly identify the anatomy.

14

The issue here, though, concerns the degree of certainty that is required concerning the identification of the anatomy. On this point, the parties offer conflicting expert evidence concerning the standard of care. Leitman maintains that the surgeon must *in fact* identify the correct structures, and that if he does not, such fact essentially means that he should have taken additional steps, such as using a cholangiogram or converting to an open procedure. In other words, Leitman contends that a surgeon's error in cutting the wrong duct essentially establishes a *per se* breach of the standard of care. Such contention appears to be in conflict with the principle that "injury alone is insufficient to prove negligence in medical malpractice cases." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. at 256, 824 A.2d at 1146. Moreover, Leitman appears to concede that it is possible for this type of injury to occur without a breach of the standard of care. (Leitman Dep. at 10) ("[I]n *most instances*, an injury such as this . . . is avoidable if surgeons comply with the standard of care."). In any event, Krusch disputes Leitman's version of the standard of care, and maintains that a surgeon only needs to take such steps as are necessary to satisfy himself that he has properly identified the relevant anatomy.[5] Krusch further maintains that Damian satisfied this standard by dissecting the area until he was satisfied that he had properly identified the relevant ducts. Consequently, Krusch states, there was no reason for Damian to perform a cholangiogram or to convert to an open procedure. Accordingly, there is a

---

[5]Plaintiffs argue: "In the instant case, Defendants acknowledge Dr. Damian erred when he performed the surgery, but argue his errors do not constitute malpractice because Dr. Damian believed he was transecting the correct ducts[.]" (Pl. Reply Memo at 5). The Court disagrees that Defendants are relying on Damian's subjective mental state. Instead, the Court understands Defendants' argument to be that Damian's decision to cut the wrong duct was not malpractice, because in making that decision, he followed the proper procedures for identifying the anatomy. Consequently, Defendants maintain, Damian's mistake does not reflect a failure to follow proper practice.

triable issue of fact concerning the appropriate standard of care.[6]

To the extent that Leitman does not contend that Damian's error is malpractice *per se*, he alternatively maintains that Damian breached the standard of care in two ways: 1) by making too many cuts; and 2) by failing to recognize the common bile duct due to its large size, as shown by his use of large surgical clips. However, Damian maintains that he intentionally cut only two structures, which he believed to be the cystic duct and the cystic artery. Damian further states that the hepatic ducts must have been accidentally and unknowingly cauterized when he was removing the gallbladder from the liver. Consequently, there is an issue of fact as to whether Damian made more than two cuts. Further, Damian contends that the clips that he used were the appropriate size to use when clipping the cystic duct, and that the duct that he cut was appropriately-sized for a cystic duct. Therefore, there is also an issue of fact as to whether the size of the duct should have caused Damian to realize that he was mistakenly cutting the common bile duct.

---

[6]The conflict between these two proposed standards of care is a recurring theme in malpractice cases involving laparoscopic cholecystectomies. *See, e.g., Wipf v. Kowalski*, 519 F.3d 380, 383-384 (7th Cir. 2008) (Plaintiff's expert opined that the standard of care requires "absolute certainty before transection," while Defendant's expert maintained that a surgeon must "us[e] accepted procedures to satisfy herself it [is] the cystic duct that she [is] about to transect.").

CONCLUSION

Defendant's motion for partial summary judgment [#25] as to liability is denied.

SO ORDERED.

Dated: Rochester, New York
January 28, 2010

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge